***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Holmes and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction of the Parties and of the subject matter.
2. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. All parties have been properly designated and there is no question as to misjoinder or nonjoinder of Parties.
4. Plaintiff alleges to have become disabled from work on March 31, 2002, secondary to occupational stress and major depression with psychosis.
5. An employment relationship existed between the Employee Matthews and Employer North Carolina Department of Correction on March 15, 2002.
6. Plaintiff's average weekly wage was $848.74, yielding a compensation rate of $565.85, subject to the salary continuation provisions of N.C. Gen. Stat. § 143-166.14.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was fifty-six years of age at the time of the hearing before the Deputy Commissioner, with a birth date of October 25, 1947.
2. After high school, plaintiff enlisted in the U.S. Air Force, where he served from 1968 to 1972, as a fire protection specialist. His job duties were to extinguish aircraft fires. He was honorably discharged in 1972.
3. Plaintiff attended Pembroke State University (now UNC at Pembroke) and graduated cum laude with a degree in sociology and an emphasis in criminology in May 1975.
4. On September 30, 1976, plaintiff was hired by the North Carolina Department of Correction as a probation parole officer trainee.
5. From 1977 until 1998, plaintiff served as an adult probation parole officer, attended court, interviewed clients, supervised files and dealt predominantly with misdemeanants.
6. Once plaintiff became familiar with the administrative aspects of the job, his job performance ratings were consistently good throughout his career.
7. In 1996, his supervisor, in an evaluation report, recommended that plaintiff take the necessary courses and focus his attention on training to become an Adult Probation Parole Officer II. In the fall of 1998, plaintiff applied for and was accepted as Adult Probation Parole Officer II and on February 1, 1999, was formally promoted to the position of High Risk Adult Probation Parole Officer II.
8. The job duties of the new position as High Risk Adult Probation Parole Officer II required that plaintiff carry a firearm, that he deal exclusively with felons, that he deal with sex offenders, that he make home visits at night into neighborhoods where felons and drug addicts lived, that he supervise house arrests and that he remain on call one week out of each month to go into these neighborhoods should a parolee or probationer break house arrest or should he be called. He was also required to search offenders, to arrest and restrain offenders and to collect, transport and handle urine samples that contained visible blood.
9. Having to carry a gun, having to deal with sex offenders, having to deal with felons, having to go into dangerous neighborhoods, having to deal with drug offenders in their neighborhoods, having to go into these neighborhoods at night and having to be on call placed significant stress upon plaintiff to the point that by August 1999, plaintiff was beginning to feel extreme stress regarding the job and his ability to continue as a career Adult Probation Parole Officer II. Plaintiff was particularly concerned about the increased rise in drug use and weapons use in recent years as compared to when he first began his career.
10. In 1996, plaintiff was having depressive episodes and sought help from the Employee Assistance Program (EAP) sponsored by the State of North Carolina. As the result of his contact with the EAP, he was eventually referred to Dr. J. W. Scott Wallace, who is a psychiatrist with Eastover Psychiatric Psychological Group in Charlotte. Dr. Wallace had had experience in dealing with other police officers and correctional officers during his career and had treated perhaps twenty or more officers for job-related stress.
11. At the time Mr. Matthews sought treatment with Dr. Wallace, he was suffering from depression and had marital and financial difficulties. With medication his condition improved and he saw Dr. Wallace on a maintenance basis for renewal of prescriptions every three months. He had remained an active patient of Dr. Wallace at the time of the hearing and at the time of the deposition of Dr. Wallace.
12. Dr. Wallace expressed the opinion to a reasonable degree of medical certainty that the increased danger and danger related stress as a High Risk Probation Parole Officer II significantly contributed to increased depression in Mr. Matthews, which ultimately led to his inability to work by February 2002, resulting in his taking a medical leave of absence effective March 15, 2002.
13. Dr. Wallace testified to a reasonable degree of medical certainty that the duties of a High Risk Probation Parole Officer II placed Mr. Matthews at a greater risk of developing disabling stress and depression than that to which the general public was exposed and that such stress and danger were routine to law enforcement as compared to the general public.
14. Dr. Wallace testified that he did not believe the depression from which Mr. Matthews began suffering in 1999 would have caused him to become disabled with respect to administrative duties and responsibilities as, for example, if he had been a librarian. It was the peculiarly dangerous nature of correctional work that was the significant contributing factor of the disabling depression.
15. In February 2002, Mr. Matthews applied for disability under the Faulkenberry Act. Mr. Matthews was found to be disabled by the Social Security Administration from any gainful employment.
16. Dr. Wallace testified to a reasonable degree of medical certainty that plaintiff was indeed totally disabled because of the severity of his depression and associated confusion and loss of concentration beginning February 20, 2002. Mr. Matthews took a medical leave of absence on March 15, 2002, and has not worked since.
17. Dr. J. W. Scott Wallace was stipulated as a medical expert in the field of psychiatry and had experience in dealing with more than twenty law enforcement officers with job-related stress disorders and who had treated Plaintiff for eight years at the time of his deposition. Dr. Wallace's testimony is credible and his opinion is accepted by the Commission.
18. Plaintiff's testimony was credible, consistent and straightforward and the undersigned accepts the testimony of plaintiff as credible.
19. Defendants have not offered any medical evidence to contradict the testimony of Dr. Wallace.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's stress related depression was due to causes and conditions characteristic of and peculiar to his employment with defendant, was not an ordinary disease of life to which members of the general public not so employed were equally exposed, and is therefore, an occupational disease. N.C. Gen. Stat. § 97-53(13), Rutledge v. TulexCorp., 308 N.C. App. 85, 301 S.E.2d 359 (1983). Pulley v. City ofDurham, 121 N.C. App. 688, 468 S.E.2d 506 (1996), Harvey v. RaleighPolice Dept., 85 N.C. App. 540, 355 S.E.2d 147 (1987).
2. Plaintiff is temporarily totally disabled as the result of an occupational disease and has been since March 15, 2002. N.C. Gen. Stat. §§ 97-53(13), 97-29.
3. Defendants shall pay to plaintiff temporary total disability benefits effective March 15, 2004, and ongoing until further orders of the Commission. N.C. Gen. Stat. § 97-29.
4. The continued treatment of plaintiff by Dr. Wallace, including medications, therapy and counseling, will give relief to plaintiff and it is substantially certain that plaintiff will require psychiatric treatment in the future on an ongoing basis. N.C. Gen. Stat. § 97-25.
5. Plaintiff is entitled to salary continuation under N.C. Gen. Stat. § 143-166-14 from March 15, 2002 to March 15, 2004.
 ***********
Based upon the foregoing Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. The Defendants shall pay to plaintiff his salary continuation under N.C. Gen. Stat. § 143-166-14 from March 15, 2002 to March 15, 2004. Said amount has accrued and shall be paid to plaintiff in a lump sum.
2. Subject to an attorney fee provided below, defendants shall pay to plaintiff $565.85 per week as temporary total disability compensation beginning March 16, 2004 and continuing until plaintiff returns to work or further orders of the Commission. The amount that has accrued shall be paid to plaintiff in a lump sum subject to the approved attorney fee.
3. An attorney fee of 25% of the compensation awarded to plaintiff in Paragraph 2 of this award is approved. Of the accrued amount defendants shall deduct 25% and send directly to plaintiff's attorney. Of the continuing amount, defendants shall send every fourth check to plaintiff's counsel.
4. Defendants shall pay for all medical treatment provided to plaintiff by Dr. Wallace for so long as said treatment is necessary to effect a cure, give relief or lessen plaintiff's period of disability.
5. Defendants shall pay the costs including an expert witness fee of $575.00 to Dr. J. W. Scott Wallace.
This the 15th day of December 2004.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
DCS/mb